**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DEBORAH BARKER, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:12-CV-00313 (JCH) |
| v. | : | |
| | : | DECEMBER 5, 2013 |
| ELLINGTON BOARD OF | : | |
| EDUCATION, | : | |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 29)**

## I.  INTRODUCTION

Plaintiff Deborah Barker ("Barker") claims that defendant Ellington Board of Education ("EBE") denied her tenure and terminated her because of her age, in violation of the Age Discrimination in Employment Act (ADEA), title 29, United States Code, sections 621 through 634.  In response, EBE has filed this Motion for Summary Judgment ("Def.'s Mot. for Summ. J.") (Doc. No. 29).

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Barker's Employment by EBE

EBE first employed Barker for the 2003-2004 school year, when Barker was 50 years old.  Defendant's Local Rule 56(a)(1) Statement ("Def.'s L.R. 56(a)(1) Stmt.") (Doc. No. 32) at ¶ 20; Plaintiff's Local Rule 56(a)(2) Statement ("Pl.'s L.R. 56(a)(2) Stmt.") (Doc. No. 37) at ¶ 20.  Barker was first a part-time aide for the kindergarten early intervention literacy and numeracy program at Center Elementary School.  Id.  Then, for the 2004-2005 school year, Barker was appointed to the position of part-time first grade math intervention teacher at Windermere School.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 22; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 22.  At that time, Frank Milbury was the principal of Windermere.  Id.

1

Though Barker's position at Windermere was eliminated due to budget cuts at the conclusion of the 2004-2005 school year and Barker was nonrenewed, she was rehired at Windermere that Fall by Milbury to work as a long-term first grade substitute teacher.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 25, 28; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 25, 28.  At the end of the 2005-2006 school year, Barker was recalled for an opening as a sixth grade teacher at Windermere, which she accepted.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 31, 33; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 31, 33.

      B.     <u>Milbury's Supervision of Barker</u>

Barker was supervised by Milbury for three years—2004-2005, 2006-2007, and 2007-2008.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 38; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 38.  In the course of his supervision, Milbury conducted formal and informal evaluations of Barker.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 39; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 39.  Milbury's formal evaluations followed three stages: a pre-observation conference where Milbury and Barker would review the script for a lesson; an observation of Barker teaching that lesson; and a post-observation conference where Barker would receive feedback from Milbury on his observation.  <u>Id.</u>  Barker emphasizes that Milbury's formal evaluations were conducted in accordance with EBE's Professional Growth and Evaluation Plan's ("Evaluation Plan") guidelines for formal "observations."  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 39.  Milbury did not retain any written documents related to the observations he conducted of Barker in the course of formally evaluating her.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 40; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 40.

Parties dispute the degree of preparation Milbury committed to informal evaluations.  EBE alleges that Milbury "simply walked into the classroom unannounced

and evaluated the 'feel of the room,' transitions, time on task and student engagement." Def.'s L.R. 56(a)(1) Stmt. at ¶ 41.  Barker notes that Milbury testified that he always had an agenda for his informal observations and asserts that the actions described by EBE were part of that agenda.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 41.  Both parties agree, however, that Milbury did not assess content during these informal evaluations.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 42; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 42.

In recalling his informal evaluations of Barker, Milbury noted that Barker showed "some disorganization"; "[w]hen it was scripted and she was confident," Milbury testified, "things went according to plan. When she was confused or had ideas, things didn't necessarily go according to plan."  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 43-44; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 43-44.  Milbury also testified that Barker sought assistance when classes did not go according to plan, that her issues were "no greater than normal," and that she improved.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 43.  Milbury observed that Barker "was stressed out at times" when placed under pressure, but suggested that such pressure was understandable and that Barker handled that pressure well.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 45; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 45.  Milbury noted that Barker had trouble with leveling of work and providing independent appropriate work for some students, and that this problem was shared by many other teachers.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 46; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 46.

Milbury wrote three Annual Evaluation Reports ("AER")—for the 2005-2006, 2006-2007, and 2007-2008 school years—on Barker's teaching.  Def.'s L.R. 56(a)(1) Stmt. at Exs. N, O, P.  Barker denies EBE's claim that the entirety of these AERs was based on a review of a portfolio she prepared; she instead asserts that Milbury drew

from this portfolio for only a portion of the AERs and notes that Milbury testified that he took his classroom observations into consideration when writing the AERs.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 47; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 47.

     C.    <u>Moccio's Supervision of Barker</u>

     Milbury retired at the conclusion of the 2007-2008 school year.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 54; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 54.  Steven Moccio was hired as the new Principal, effective July 1, 2008, and Kristy LaPorte was hired as a part-time Assistant Principal and part-time special education supervisor.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 55-56; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 55-56.  When Moccio and LaPorte began at Windermere, Barker was 56 years old.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 57; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 57.

     Moccio's first observation of Barker's teaching, in September 2008, was informal; Barker reported that the evaluation based on this observation was "very positive," and that Moccio did not provide any criticisms of her performance.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 60-61; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 60-61.  Through December 2008, Moccio had no criticisms of Barker and, during this period, Barker did not believe that Moccio was discriminating against her.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 63; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 63.

     Moccio conducted his first formal observation of Barker in January of 2009.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 64; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 64.  In his evaluation, Moccio provided four suggestions for addressing those aspects of Barker's performance that he felt needed improvement: 1) start the class by stating the objective of the lesson and concluding the class with a synopsis of the most important parts of that lesson; 2)

provide students with the curricular objectives and how they relate to prior material learned; 3) use higher order thinking on Bloom's Taxonomy rather than purely knowledge-based skills; and 4) use techniques to address differing learning styles within the classroom.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 68; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 68.

Barker disputes the accuracy of Moccio's first formal evaluation.  Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 65-66.  Barker claims that Moccio was mistaken in writing that she did not clearly state the objective of the lesson because she displayed a cork board that clearly stated the lesson objective.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 65.  Barker notes that her claim is corroborated by the evaluation itself, which states that "Mrs. Barker then utilized a corkboard where she had listed the 6 major biomes found on Earth."  Id.; Def.'s L.R. 56(a)(1) Stmt. at Exh. R, at 4.  Barker also contends that she did use teaching techniques that addressed different learning styles.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 69.  Further, Barker disagrees with Moccio's implication that she did not encourage use of the upper levels of Bloom's Taxonomy in her teaching.  Id. at ¶ 74.  She specifically claims that the one example Moccio provided of a lesson that would promote higher level thinking was a project that she devised for that very purpose.  Id. at Exh. 22, at ¶ 4.  The parties agree, however, that when Moccio communicated the results of his first formal observation to Barker, Barker appeared surprised by his findings.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 75; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 75.

Moccio conducted a second in-class observation of Barker a few weeks later.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 77; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 77.  As did the previous evaluation, Moccio's second evaluation contained both negative and positive comments on Barker's performance.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 79; Pl.'s L.R. 56(a)(2) Stmt. at

¶ 79.  The evaluation provided three strategies to address those areas still in need of improvement: 1) clearly state an objective at the beginning of class, organize the lesson to promote that objective, and ensure that students understand the objective behind any activity; 2) use informal assessment during class to evaluate how students were understanding the content of the lesson; and 3) at the beginning and end of class, provide the students with the "why" behind the activity being performed.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 81; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 81.

Barker again contests the accuracy of Moccio's second evaluation, testifying that she believed the evaluation was "unfair, inaccurate, and discriminatory."  Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 80-81.  She disagrees with part of the observation section in the evaluation: she states that a higher proportion of students were "on task" than the observation reports.  Id. at ¶ 78.  She also claims that she made multiple efforts to redirect and alter her lesson when she noticed that doing so was necessary, and that, in light of one of Moccio's suggestions from the first evaluation, she made a particular point of stating the lesson objective of the lesson at the beginning of the lesson.  Id., at Ex. 22, at ¶¶ 6-7.  Barker was "very upset" by Moccio's second evaluation.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 83; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 83.

On February 3, 2009, Barker received a letter from Stephen Cullinan, the Superintendent of Schools, alerting her and all other non-tenured teachers that EBE would be considering the nonrenewal of all non-tenured teachers at their next meeting in late February.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 87-88; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 87-88.  The reason for the nonrenewal was budgetary constraints.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 89; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 89.

Three days later, Moccio conducted another observation of Barker; the observation was informal, and Moccio informed Barker that the evaluation would not become part of her personnel file.[1]  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 85, 90; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 85, 90.  The evaluation reported that the given objective "did not match the instructional strategies implemented;" the lesson's intent, aside from reviewing previously taught material, was unclear; questions asked of the students tested only low level knowledge and did not require the students to use any higher order thinking; the lesson did not respond to different learning styles; and challenging assignments for students completing their work early were not provided.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 92; id. at Ex. U, at 3.

Barker denies that Moccio's informal observation reflected any continued deficiencies in her performance.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 91-92; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 91-92.  Moccio's notes from this observation, according to Barker, reflect that she "stated the objective of the lesson, described the ["]what and why["] of the lesson, called upon students to compare and contrast, which involves one of the higher learning levels, and used teaching methods that appeal to different learning styles."  Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 91-92.  Barker claims that, when she met with Moccio to discuss the informal evaluation, she told him that she believed his judgment was biased.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 93.

---

[1] The parties dispute how this observation was arranged. EBE states that Moccio offered to conduct another informal observation of Barker during the meeting held to discuss the second evaluation of Barker.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 84.  Barker denies this statement, apparently on the basis that she cannot recall whether anything within Moccio's informal evaluation is accurate.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 84; id. at Ex. 16, at 169:6-23, 170:12-15. Barker also denies that she expressed interest in the informal evaluation or agreed to participate in it.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 86, 90; id. at Ex. 16, at 170:19-22.

EBE voted to nonrenew all 56 non-tenured teachers, including Barker, on February 25, 2009.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 94; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 94. Barker received notice of her nonrenewal on February 26, 2009.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 95; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 95.

Two days later, Moccio met with Barker and her union representative to discuss the informal evaluation and reiterated that the evaluation would not be made part of her personnel file.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 96-97; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 96-97.  At this meeting, Moccio offered to have LaPorte conduct another informal evaluation of Barker.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 98; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 98. Moccio told Barker that LaPorte's informal observation would allow Barker to compare Moccio's findings with LaPorte's to ensure accuracy in the evaluation process.  Id. Barker, however, insists that LaPorte's evaluation was not used for this purpose, and that her evaluation contradicted many of Moccio's criticisms of Barker's performance. Pl.'s L.R. 56(a)(2) Stmt. at ¶ 98.  Moccio also informed Barker that he would not discuss his evaluations of her with LaPorte, or give LaPorte any direction in what to look for, prior to LaPorte's observation.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 99; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 99.

   D.   LaPorte's Evaluation of Barker

Barker agreed to an informal evaluation by LaPorte.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 107; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 107.  Barker contends that LaPorte's observation of her was not neutral because LaPorte's judgment was influenced by her knowledge that Moccio was dissatisfied with Barker's teaching.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 100, 110; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 100, 110.  Barker also contests EBE's claim that

Moccio and LaPorte did not speak about the reason for the observation before it occurred; Barker notes that LaPorte testified that Moccio told her that he wanted her to conduct the observation because he had "concerns" about Barker's work.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 108; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 108; see also Pl.'s L.R. 56(a)(2) Stmt. at Ex. 19, at 42: 3-8.   Moccio, however, refused LaPorte's requests for background information about the nature of Moccio's concerns, or even a copy of his prior evaluations of Barker.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 109; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 109.

LaPorte's informal evaluation of Barker took place on March 24, 2009.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 111; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 111.  LaPorte and Barker met prior to the observation to discuss Barker's planned lesson; they also discussed the nature of Moccio's concerns after, Barker claims, LaPorte told her that she knew that Moccio had concerns about her work.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 113-14; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 113-14.  LaPorte and Barker specifically discussed how Barker could use differentiation of lesson material to accommodate different types of learners during the observation lesson.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 114-15; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 114-15.

EBE reports that, based on her conversation with Barker beforehand, LaPorte went into the observation believing that she would be observing a good lesson; Barker's performance during the observation, however, raised significant concerns for LaPorte.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 116-17.  EBE claims that LaPorte identified the following deficiencies in Barker's teaching: the assignment Barker gave to the class only required them to use knowledge-based learning on Bloom's Taxonomy; Barker's heterogeneous

grouping of students was not done appropriately, making the group activities ineffective and leaving some students behind in the work, and Barker failed to intervene when it became apparent that the grouping was unsuccessful; and Barker's lesson did not use differentiation and did not provide students who finished their work early with activities. Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 118-128.

Barker asserts that LaPorte's report regarding the observation lesson was inconsistent and inaccurate, and that the report's inaccuracies reveal that LaPorte's judgment was biased.  Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 116-17.  She alleges that she did prepare materials that required higher level thinking, and that LaPorte testified that these higher level materials were available to students who finished their work early.  Id. at ¶¶ 118, 128.  She agrees that LaPorte reported that Barker did not use differentiation, but claims that LaPorte "meant something different from what Moccio meant when he used that term."  Def.'s L.R. 56(a)(1) Stmt. at ¶ 127; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 127. As for Barker's grouping of the students, she alleges that LaPorte's description of the grouping was inaccurate and she denies that the students were grouped inappropriately.  Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 120-21.  She takes particular issue with LaPorte's characterization of two students as special education students.  Id. at ¶¶ 120-23.  The parties agree that this characterization was mistaken, and that the two students were not special education students but rather were, in fact, receiving reading support. Def.'s L.R. 56(a)(1) Stmt. at ¶ 124; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 124.

E.    Moccio's Decision to Non-Renew Barker

Following LaPorte's informal observation, LaPorte and Barker met; Barker was upset about LaPorte's evaluation.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 130; Pl.'s L.R. 56(a)(2)

Stmt. at ¶ 130.  LaPorte also reported her findings to Moccio.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 131; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 131.  The parties dispute whether LaPorte discussed Barker's need for improvement with Moccio; while EBE claims that she did, Barker notes that Moccio testified that he did not recall such a conversation, and that LaPorte testified that she gave Moccio her observation report and told him that it contained her observations and recommendations.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 132; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 132.  LaPorte also informed Moccio that Barker was upset during the post-observation conference.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 133; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 133.

Moccio recommended nonrenewal of Barker to Cullinan.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 138; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 138.  The parties dispute the basis for this recommendation.  EBE cites to Moccio's testimony that, based on LaPorte's observation and his own evaluation of Barker's performance, he did not believe that Barker had made the necessary improvements to her teaching, and, as a result, her teaching remained deficient.  Def.'s L.R. 56(a)(1) Stmt. at ¶¶ 134, 137.  Moccio also testified that, given that this was Barker's final year as a non-tenured teacher, continued employment of Barker would not result in any improved performance in the future.  Id. at ¶¶135-36.  Barker denies EBE's claims; she insists that she performed quality work and addressed the issues that Moccio raised with her performance, and claims that the observation reports were inconsistent and inaccurate.  Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 134-35, 137.

Cullinan and Moccio determined that Barker should be allowed to resign in lieu of nonrenewal, as was consistent with EBE policy.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 139;

Pl.'s L.R. 56(a)(2) Stmt. at ¶ 139.  In April of 2009, Moccio met with Barker and two union representatives to inform her that her nonrenewal would remain in effect and that she would not be tenured.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 140; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 140.  He also offered Barker the opportunity to resign in lieu of nonrenewal.  Id. Barker chose not to resign.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 141; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 141.

In May of 2009, Moccio completed Barker's Annual Evaluation Report.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 145; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 145.  Barker refused to participate in the Report and did not complete her portions of it.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 146; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 146.  In the Report, Moccio identified four areas in need of improvement in Barker's performance: 1) increasing the effectiveness of lessons through a clear statement of the lesson objection and organizing the lesson to promote achievement of that objective; 2) clearly establishing the "what" and "why" behind the activity or lesson; 3) developing students' analytical and comprehension skills by expanding student learning to the higher levels of Bloom's Taxonomy; and 4) increasing the amount of differentiation within the classroom to help meet the needs of individual learners.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 147; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 147.  EBE alleges that Moccio's concerns in the Report, with the exception of the clear statement of the lesson objective, were consistent with those raised by LaPorte in her informal observation.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 148.  Barker denies that the Report was consistent with LaPorte's observation.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 148.

Barker never complained to any school official that she believed her nonrenewal was due to her age.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 150; Pl.'s L.R. 56(a)(2) Stmt. at ¶

12

150.  Since Moccio has been Principal of Windermere, he has only recommended the

nonrenewal of two non-tenured teachers for performance reasons—Barker and "JB,"

who was 25 years old at the time, and who opted to resign in lieu of termination.  Def.'s

L.R. 56(a)(1) Stmt. at ¶ 151; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 151.  Barker, however, notes

that Moccio recommended the non-renewal of this younger teacher during the recently

completed academic year, four years after the litigation of her ADEA claim began.  Pl.'s

L.R. 56(a)(2) Stmt. at ¶ 151.  EBE also claims that Cullinan directly recommended that

another younger teacher, "TL" be nonrenewed.[2]  Def.'s L.R. 56(a)(1) Stmt. at ¶ 152.

"TL" was 27 at the time of her nonrenewal, and she decided to resign in lieu of

termination.  Id.  Since Moccio became Principal, one teacher who is older than Barker

and was supervised by Moccio has become tenured: Anita Sussman, who was 60 at the

time of tenure.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 153; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 153.

     F.    The EBE Special Assistance Program

     EBE's Evaluation Plan governs how both tenured and non-tenured teachers are

evaluated.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 11; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 11.  Non-

tenured teachers are evaluated in accordance with the "induction phase" of the

Evaluation Plan, which provides that non-tenured teachers who successfully meet the

requirements of the induction phase become tenured after four years.  Def.'s L.R.

56(a)(1) Stmt. at ¶¶ 13-14; Pl.'s L.R. 56(a)(2) Stmt. at ¶¶ 13-14.  The Evaluation Plan

allows supervisors to place teachers "who need special assistance in meeting the

---

[2] Barker denies this statement on the grounds that the source cited for it does not
support it.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 152.  EBE appears to have mistakenly cited to the
wrong affidavit for this statement; support for it is found in the Affidavit of Steven A. Moccio, not
the Affidavit of Stephen C. Cullinan, as was cited.  See Affidavit of Steven A. Moccio (Doc. No.
30-2), at Ex. E at ¶ 24.

requirements" of the induction phase in a Special Assistance Program.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 14; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 14.  Parties dispute whether placement in the Special Assistance Program is mandatory for non-tenured teachers failing to meet the induction phase's requirements: EBE highlights the Evaluation Plan's statement that a supervision "may" place such a teacher in the Special Assistance Program, while Barker quotes the Evaluation Plan's statement that non-tenured teachers "will" be placed in the Special Assistance Program.  Id.

Barker was not placed in the Special Assistance Program prior to her non-renewal.  Moccio has never placed any non-tenured teacher in the Special Assistance Program prior to non-renewal.[3]  Def.'s L.R. 56(a)(1) Stmt. at ¶ 18; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 18.  Barker, however, notes that Moccio had never decided to non-renew any non-tenured teacher other than herself until after Barker raised the failure to place her in the Special Assistance Program as an issue in her litigation against EBE.  Pl.'s L.R. 56(a)(2) Stmt. at ¶ 18.  Moccio elected to non-renew one non-tenured teacher, "JB," who was in her mid-20s at the time, without first placing her in the Special Assistance Program; Moccio non-renewed JB in January of 2013, after Barker had filed suit.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 19; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 19.

### III.   STANDARD OF REVIEW

A motion for summary judgment is properly granted only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir.2011).

---

[3] EBE insists that no school in its district places non-tenured teachers in the Special Assistance Program; but as both parties agreed to confine discovery to only the practices of Windermere, and not to inquire into the practices of other schools in the district, the court will not consider this claim.  Def.'s L.R. 56(a)(1) Stmt. at ¶ 17; Pl.'s L.R. 56(a)(2) Stmt. at ¶ 17.

Thus, the role of the district court in deciding a summary judgment motion "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact." Id. In making this determination, the court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir.2013).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir.2010). Once the moving party has satisfied that burden, to defeat the motion "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir.2009) (quoting Fed. R. Civ. P. 56(e)). "For summary judgment purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor." Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co., 421 F. App'x 52, 53 (2d Cir.2011); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir.2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (stating that the non-moving party must point to more than a mere "scintilla" of evidence in its favor). "[U]nsupported allegations do not create a material issue of fact." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000).

## IV.   DISCUSSION

EBE argues that, as a threshold matter, this court lacks jurisdiction over Barker's ADEA claim because she failed to exhaust her administrative remedies under Connecticut law. Def.'s Mot. for Summ. J. at 1. EBE also asserts that, even if the court

does have subject matter jurisdiction over Barker's challenge, this challenge presents

no genuine issue of material fact because Barker has provided no evidence that EBE's

stated basis for her termination was pretextual.  Id.

A.    Exhaustion

EBE insists that Barker's failure to seek a hearing, pursuant to Connecticut

General Statutes §10-151(c), was a failure to exhaust her administrative remedies that

deprives this court of subject matter jurisdiction over her suit.  Memorandum of Law in

Support of Motion for Summary Judgment ("Def.'s Summ. J. Mem.") (Doc. No. 30) at

20.  The majority of cases EBE cites in support of this proposition are state court cases.

Id. at 20-23.  As EBE itself acknowledges, "state law sources . . . are thoughtful and

persuasive, though not binding. . . ."  Insurity, Inc. v. Mutual Group, Ltd., 260 F. Supp.

2d 486, 489 (D. Conn. 2003); see Def.'s Summ. J. Mem. at 22 n.10 (quoting Insurity).

Further, none of these state cases addresses exhaustion under the ADEA, or even

concerns an ADEA claim.  See Garcia v. City of Hartford, 292 Conn. 334 (2009)

(addressing whether party seeking petition for writ of mandamus was required to first

exhaust under collective bargaining agreement); Murphy v. Young, 44 Conn. App. 677

(1997) (addressing whether failure to exhaust under section 10-151 deprived court of

subject matter jurisdiction over state law claims); Devlin v. Bennett, 26 Conn. Supp. 102

(1965) (addressing whether non-tenured teachers have a right to a hearing under

section 10-151 when so requested); Diaco v. Norwalk Public School Dist., No.

FSTCV106007107S, 2012 WL 2899100 (Conn. Super. June 19, 2012) (addressing

whether failure to exhaust under section 10-151 deprived court of subject matter

jurisdiction over state law claims).  They are thus unhelpful for determining whether Barker failed to exhaust under the ADEA.

The only federal case cited by EBE, Sekor v. Capwell, 1 F.Supp.2d 140 (D. Conn 1998)—also the only cited case involving an ADEA claim—is inapposite.  In Sekor, the court declined to consider an ADEA claim because it found that the plaintiff's age discrimination claim had previously been adequately litigated in a section 10-151 hearing.  1 F.Supp.2d at 145-46.  Contrary to EBE's assertion that this finding is "directly on point" for the question of exhaustion under the ADEA, Reply to Plaintiff's Opposition to the Defendant's Motion for Summary Judgment ("Def.'s Reply") (Doc No. 40) at 3, Sekor's holding concerned only whether the plaintiff's federal claim was precluded by the prior litigation of that claim in state proceedings, 1 F.Supp.2d at 145. The Sekor court did not hold that individuals seeking relief under the ADEA must first avail themselves of a section 10-151 hearing.  Hence, EBE's arguments that Barker failed to exhaust by not seeking a section 10-151 hearing are unavailing.

Because Barker's claim for relief arises under the ADEA, the appropriate source for determining whether Barker has exhausted is the ADEA itself.  The ADEA requires that individuals alleging age discrimination timely file a charge with the Equal Employment Opportunity Commission ("EEOC") and wait 60 days before bringing suit in federal court.  29 U.S.C. § 626(d)(1).  In a state that has its own agency to protect employees from age discrimination, the claimant must also file a discrimination charge with that agency within 300 days of the alleged unlawful employment practice before bringing federal suit.  Id. §§ 626(d)(1)(B), 633(b).  Connecticut has such an agency—the Commission on Human Rights and Opportunities ("CHRO")—and under the Connecticut

17

Fair Employment Practices Act, an individual alleging age-based employment discrimination can file a complaint with the CHRO.  C.G.S. §§ 46a-82(a), 46a-60(a)(1).

Barker appears to have first filed a Complaint with CHRO, which was then sent to the EEOC by CHRO.  Pl.'s L.R. 56(a)(2) Stmt, at Exh. 13 (EEOC Notice of Receipt of Charge of Employment Discrimination); see also id. at Exh. 2 (EBE's Answer to Barker's Affidavit of Illegal Discriminatory Practice filed with the CHRO).  She also obtained a "Notice of Right to Sue" from the EEOC on January 25, 2012.[4]  Id. at Exh. 14.  She then filed a Complaint in this court on March 2, 2012.  Complaint.  Thus, Barker has exhausted under the ADEA.[5]

B.   Summary Judgment

To withstand a motion for summary judgment, an ADEA claim must survive the three-part burden-shifting test established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  McDonnell, 411 at 802, 805; McPherson v. New York City Dept. of Educ, 457 F.3d 211, 215 (2006).  Under this test,

> [A] plaintiff first bears the "minimal" burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a "legitimate, nondiscriminatory reason" for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

---

[4] Barker was not required to obtain a right-to-sue letter before commencing suit under the ADEA.  See Holowecki v. Federal Exp. Corp., 440 F. 3d 558, 563 (2d Cir. 2006) ("[T]he ADEA does not require an aggrieved party to receive a right-to-sue letter from the EEOC before filing suit in federal court.").

[5] Because the court finds that Barker has fulfilled the exhaustion requirements of the ADEA, it declines to consider Barker's argument that EBE waived any argument that Barker failed to exhaust or EBE's argument that a failure to exhaust deprives the court of subject matter jurisdiction.  Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem.") (Doc. No. 36) at 21; Reply to Plaintiff's Opposition to the Defendant's Motion for Summary Judgment ("Def.'s Reply") (Doc No. 40) at 1-2.

McPherson, 457 F.3d at 215.  On summary judgment, then, the court must examine the plaintiff's proffer of evidence to determine whether a jury could reasonably conclude, based on that proffer, that the plaintiff's age actually motivated the defendant's conduct and that age was the "but for" reason for the defendant's conduct.  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 141 (2000); Gross v. FBL Financial Servs., Inc., 557 U.S. 167, 177 (2009).

    i.  <u>Prima Facie</u> Case

   To establish a <u>prima facie</u> case of age discrimination, Barker must show that 1) she was within the protected age group, 2) she was qualified for the position, 3) she experienced adverse employment action, and 4) that action occurred under circumstances giving rise to an inference of discrimination.  <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 107 (2d Cir. 2010).  EBE concedes, for the purposes of its Motion for Summary Judgment, that Barker would be able to prove a <u>prima facie</u> case of age discrimination under the ADEA, as she was within the protected age group, met the minimum qualifications for the teaching position, experienced an adverse employment action when her contract was non-renewed and she was denied tenure, and was replaced by someone younger than her.  Def.'s Summ. J. Mem. at 24.

    ii.  Legitimate Nondiscriminatory Reason

   EBE's burden of production for rebutting Barker's <u>prima facie</u> case for discrimination is "not a demanding one," and requires only "an explanation for the employment decision," supported by evidence that, if true, would permit the conclusion that the reason for the decision was non-discriminatory.  <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 446 (2d Cir. 1999); <u>Schnabel v. Abramson</u>, 232 F.3d 83, 88 (2d. Cir.

2000).  EBE contends that Barker was nonrenewed and denied tenure because "she was not adequately performing her job, despite being given numerous opportunities to improve her performance."  Def.'s Summ. J. Mem. at 25.  EBE has submitted the critical evaluations conducted by Moccio and LaPorte as evidence supporting this explanation. Id.  Thus, as EBE has provided a non-discriminatory basis supported by evidence explaining its non-renewal of Barker, it has satisfied its burden here.

### iii.    Pretext

Under the McDonnell Douglas framework, once the defendant has articulated a non-discriminatory basis for the adverse employment action, "the question in reviewing a motion for summary judgment becomes whether the evidence, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding" that the employment action was actually motivated by discrimination.  Tori v. Marist College, 344 Fed. Appx. 697, 699 (2d Cir. 2009).  "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the [employment action]. . . .  To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination."  Weinstock v. Columbia University, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks and citations omitted).

It is permissible "for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  Reeves, 530 U.S. at 147; see also Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 142 (2d Cir. 1993) ("[A] factfinder's disbelief

of a defendant's proffered rationale may allow it to infer the ultimate fact of intentional

discrimination in some cases.").[6]  Further, "[i]n employment discrimination cases," the

Second Circuit has cautioned, "courts must give particular scrutiny to subjective

evaluation[s], because any defendant can respond to a discrimination charge with a

claim of some subjective preference or prerogative and, if such assertions are accepted,

prevail in virtually every case and a discriminatory consideration such as age could play

into the formation of subjective impressions."  Weiss v. JPMorgan Chase & Co., 332

Fed.Appx. 659, 661 (2d Cir. 2009) (quotation marks and citation omitted).  Barker

appears to argue that a jury could find that EBE's explanation for her nonrenewal was

pretextual because it was based on evaluations that Barker asserts are inaccurate and,

from that finding, infer discriminatory intent.  Pl.'s Mem. at 34-35.

A genuine issue of disputed fact as to pretext is raised by Barker's evidence that

Moccio's evaluations of her performance, which form the basis for her nonrenewal, are

internally inconsistent, contradictory, and undermined by LaPorte's observations.  EBE

urges that Barker was non-renewed because her classroom performance was

inadequate, as documented by both Moccio and LaPorte, and because she failed to

---

[6] EBE argues that pretext is "only established where Plaintiff has evidence of both (a) falsity and (b) plausibility."  Def.'s Reply at 4 (emphasis in original).  Nothing within St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993), which EBE cites in support of this proposition, creates such a cut-and-dry standard, however.  Hicks merely holds that, once the defendant has met its burden of production, "the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against" her, and that rejection of the defendant's proffered reasons may suffice to show, but does not compel a finding of, intentional discrimination.  509 U.S. at 511 (internal quotation marks and citation omitted).  Determining whether a reasonable jury could reject a defendant's proffer and from that, find that the defendant intentionally discriminated against the plaintiff, must be done "case-by-case."  Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000).

improve.  Def.'s Summ. J. Mem. at 25.  In response, Barker argues that Moccio's criticisms are undermined by his actual descriptions of her teaching.[7]

She first notes that, though Moccio claimed in his first formal observation of Barker that she failed to give a clear statement of her lessons, his observation summary states that Barker began her lesson by "reading an opening statement from the book" and referring to a cork board describing the subject of the lesson.  Pl.'s Mem. at 28; Def.'s L.R. 56(a)(1) Stmt. at Ex. R, at 4.  Moccio's second formal observation also recommends that Barker clearly state the objective of the lesson to the class, but the observation summary reports that Barker reminded the students of the work being done that week regarding the assigned exercise, and she explained the steps in the exercise and what the class would be doing that day.  Pl.'s Mem. at 28;  Def.'s L.R. 56(a)(1) Stmt. at Ex. S, at 4.

Moccio's second formal observation asserts that Barker failed to "clearly establish the 'why' behind the activity or lesson;" Barker argues that the failure to clearly establish the "why" is the same thing as the failure to give a clear statement of the lesson.  Def.'s L.R. 56(a)(1) Stmt. at Ex. S, at 5; Pl.'s Mem. at 28.  In support of this, Barker observes that Moccio used the terms "what and why" and "objective" interchangeably.  Pl.'s Mem. at 28-29; see Pl.'s L.R. 56(a)(2) Stmt. at Ex. 18, at 7

_____

[7] Barker frames this argument around the AER that Moccio prepared on Barker at the end of the 2008-2009 school year, drawing upon the recommendations for improvement listed in the Report.  EBE appears to assert that the AER cannot form the basis of Barker's argument because "there is no evidence that these were the reasons for nonrenewal."  Def.'s Reply at 7.  However, EBE also notes that the AER was a summary of concerns identified in the evaluations of Barker conducted during the school year.  Id.  Given that EBE's explanation for Barker's nonrenewal was her deficient classroom performance—an explanation it supports by citing Moccio's evaluations of her—EBE's claim that the summary of these evaluations in the AER are not the reasons for Barker's nonrenewal is unavailing.

(responding to a question of why stating the objective is important by noting, in part, that "[the students] need to understand why they're doing what they're doing on that given day"), 39-40 (responding to question of what else Barker should have done to establish the "what and why" of the lesson by stating that she should "clearly state the objective of the lesson and then the explanation about why that objective is important to them).

Whether Barker improved, following the recommendations of Moccio, is also a disputed issue.  Moccio's first formal evaluation stated that Barker needed to clearly state the objective of the lesson, focus curricular objectives on previous and future learning, promote the use of higher-order thinking among the students, and employ additional techniques to address the variety of learning styles and needs of all learners. Def.'s L.R. 56(a)(1) Stmt. at Ex. R, at 5-6.  Moccio's second formal evaluation reiterated a need for Barker to clearly state the lesson objective, and then made two new suggestions for improvement—using informal assessments with the students to make changes in the lesson as needed and clearly establishing the "why" behind the lesson. Id. at Ex. S, at 5.  The evaluation did not mention any of the other concerns with Barker's performance noted in the first evaluation.  Moccio's informal observation of Barker repeated the first evaluation's concerns, that Barker's teaching tested only low-level knowledge and failed to respond to different learning styles, but the observation did note that Barker stated the objective of the lesson.  Id. at Ex. U, at 3.  LaPorte's informal evaluation of Barker also found that Barker stated the objective and explained the "what and why" of the lesson, and that Barker responded to different learning styles. Id. at Ex. Y; Pl.'s L.R. 56(a)(2) Stmt. at Ex. 19, 78:15-23, 79:1-3.

EBE contends that, so long as Moccio's assessments of Barker's performance were not based upon her age, their accuracy is irrelevant.  Def.'s Reply at 6.  In support of this claim, EBE cites Gilman v. Runyon, 865 F. Supp. 188 (S.D.N.Y. 1994), which cautions that the fact finder should not "assess whether the employer's decision was erroneous or even rational, so long as the employer's actions were not taken for a discriminatory reason."  865 F. Supp. 188 at 193.  This statement in Gilman, however, is in tension with the subsequent decision in Reeves that discriminatory intent can be inferred from the falsity of an employer's justification for its adverse action.  530 U.S. at 147.  Barker argues just that—that EBE's reasoning for her nonrenewal was founded on error and thus is a pretext for discriminatory intent.  In light of Reeves, the court cannot dismiss evidence that Moccio's evaluations of Barker were inaccurate.  The decision in McPherson v. NYC Dept. of Educ, 457 F.3d 211 (2d Cir. 2006), which EBE also cites, fails to persuade the court otherwise.  McPherson notes that, in a discrimination case, the court is "decidedly not interested in the truth of the allegations against plaintiff," but is instead interested in "what motivated the employer."  457 F.3d at 216.  The plaintiff in McPherson, however, offered no meaningful evidence of pretext, and instead attempted to attack her employer's conclusions on hearsay grounds.  Id. at 215, 216. 216 n.7.

EBE also asserts that the court should not "second guess" Moccio's conclusions.  Def.'s Reply at 7.  In this regard, the court agrees.  In Soderberg v. Gunther Int'l Inc., 124 Fed.Appx. 30 (2d Cir. 2005), the Second Circuit observed that the plaintiff's claim that her former employee's complaints were "petty" did not provide a basis for a jury finding of pretext: "[t]o demonstrate that an employer's proffered legitimate reason for termination is a pretext for discrimination, a plaintiff must do more that conclusorily

dismiss the reason as petty . . . she must adduce admissible evidence that the reason is false." 124 Fed.Appx. at 32. Here, Barker has adduced admissible evidence that Moccio's conclusions were erroneous. Such evidence does not second guess his conclusions, but instead raises an issue of material fact as to whether EBE's proffered reason for nonrenewing Barker, which is based on these conclusions, is false.

As Barker has, per <u>Reeves</u>, demonstrated a prima facie case of discrimination and provided evidence upon which a jury may find that EBE's justification for termination is undermined, she has established pretext. 530 U.S. at 147. Summary judgment is denied on this basis.[8]

## IV.    CONCLUSION

Given that the court cannot conclude that a jury could not find that Barker was non-renewed because of her age, EBE's Motion for Summary Judgment (Doc. No. 29) is **DENIED**.

       **SO ORDERED.**

Dated at New Haven, Connecticut this 5th day of December, 2013.

                                      __/s/ Janet C. Hall _____
                                      Janet C. Hall
                                      United States District Judge

_____

       [8] Barker has raised a number of additional grounds for denying summary judgment. Pl.'s Mem. at 26-34. As the court has found a genuine issue of disputed fact in the performance evaluations of Barker conducted by Moccio and LaPorte, it need not address these other grounds, with one exception.

       Barker has argued that a jury could find pretext on the basis of the existence of past positive evaluations of her teaching from Milbury. <u>Id.</u> at 26-27. As a matter of law, however, Milbury's past positive evaluations of Barker cannot support a finding of pretext. <u>See</u> <u>Mattera v. JPMorgan Chase Corp.</u>, 740 F.Supp.2d 561, 577 (S.D.N.Y. 2010) ("demonstration of past positive performance is insufficient to raise a genuine issue of disputed fact with respect to pretext"); <u>Godfrey v. Ethan Allen, Inc.</u>, No. 96-7978, 1997 WL 279933, at *2 (2d Cir. 1997) (unpublished table decision) (holding that evidence of favorable evaluations prior to demotion cannot alone support a finding that the given reason for the demotion of poor performance was pretextual).

25